[Civ. No. 18471. Second Dist., Div. One. Oct. 16, 1951.]

ACE REALTY COMPANY (a Corporation), Appellant, v. HARRY R. FRIEDMAN et al., Respondents.

Allen J. Greenberg, A. E. Coppleman and Sam Bubrick for Appellant.

J. George Bragin for Respondents.

DRAPEAU, J.—On October 2, 1946, the plaintiff by instrument in writing leased certain premises to defendants for use as a meat market. This lease ran for two years and provided for a monthly rental of $260; receipt of the first month's rent being duly acknowledged therein. Defendants failed to pay the installments of rent due on November 3, 1946, to and including April 3, 1947, amounting to the sum of $1,560; and on April 26, 1947, they surrendered the premises. Plaintiff rerented the store to third parties from May 1, 1947, to May 1, 1948. On the last named date the premises were taken over

by the State of California under condemnation proceedings.

The new lessees paid $200 per month instead of $260 or $720 less than the lease with defendants called for.

By this action, plaintiff seeks to recover such $720; the $1,560 on account of unpaid rentals; and $1,000 for alleged damages to a meat cooler; a total of $3,280, together with attorney's fees for $250 and costs.

Defendants by their answer and cross-complaint alleged that simultaneously with the execution of the lease they paid plaintiff the sum of $6,000 in cash as security "against any possible damages which it might sustain by reason of the cross-complainant's failing to abide by the terms of the aforesaid lease." It was further alleged that defendants also turned over to the plaintiff $520 "as and for consideration of the signing of the aforementioned lease."

Defendants admitted that the $1,560 for rental of the property had not been paid, but that plaintiff had reimbursed itself therefor out of the said $6,520 which it had received from them, leaving a balance of $4,960 for which sum defendants prayed a judgment against the plaintiff.

The trial court found in favor of defendants on their cross-complaint, to wit: that the premises were rerented by plaintiff on its own account and not for defendants' account; that no loss was sustained by reason of any damage to the meat cooler; that defendants gave to plaintiff the sum of $6,000 in cash to secure plaintiff against any possible damage it might sustain by reason of defendants' failure to abide by the terms of the lease; that in addition thereto, defendants paid plaintiff $520 as and for consideration of the signing of the lease, which $520 was to apply to the last two months' rent of said premises. Further, that defendants failed to pay $1,560 in rentals, but that after plaintiff had reimbursed itself therefor out of the $6,520, there remained a balance due and owing to defendants of $4,960.

From the judgment which followed, plaintiff appeals.

It is here contended as follows:

(1) The evidence was insufficient to support the findings or the judgment on respondents' cross-complaint;

(2) It was error for the court to admit oral evidence of the alleged payment by respondents;

(3) The dismissal of appellant's first cause of action was predicated on errors of law and was not supported by the evidence;

(4) The evidence is insufficient to sustain the court's finding that no damage had been done to appellant's property.

In negotiating the lease of the premises at 821 North Figueroa Street, Mr. Felix Napolitano represented appellant corporation as its president. He had known Mr. Eddie Berger for a long time and through him had met his cousin, Mr. Harry Berger. The Bergers ran the Olympic Meat Market. Sometime in September of 1946, Mr. Napolitano, the Bergers and the respondents Mintzer, Friedman and Feldman met at the Figueroa Street store. The respondents had recently arrived in Los Angeles from Washington, D. C., and were eager to get established and to bring their families to their new home. Respondents and Mr. Harry Berger were all brothers-in-law. Both Harry and Eddie Berger offered "to show us the ropes" and help them to get started in the meat business. When the six men met on October 2, 1946, the terms of the lease were discussed and a rental of $260 per month was agreed upon. At the same meeting, Mr. Napolitano stated: "Fellows, I want $8,000 as security for the lease and fixtures, and I don't want anything in writing, and it has to be all cash." After some discussion, respondents offered him $5,000 which he refused, saying it was not enough because they were inexperienced in the business and he had a lot of equipment in the store. Respondents then agreed to give him $6,000, and Mr. Napolitano repeated that it was to be in cash; nothing in writing. Respondents did not have cash and Mr. Napolitano refused to take their checks. So Mr. Eddie Berger said, "If you want the cash, I'll cash the checks for them and give you the cash." The group then drove over to the Olympic Meat Market where checks aggregating $6,000 were drawn on Washington banks to the order of "cash" and given to Mr. Eddie Berger.

Two of these checks were introduced in evidence at the trial. With respect to the third, Mr. Friedman testified that he gave Mr. Berger a check for $2,000 drawn to the order of cash on the City Bank of Washington, D. C., at the time in question; that he had attempted to locate the cancelled check, but apparently his wife had mislaid it at the time they moved from Washington to Los Angeles.

It was also testified that when the checks were given, Mr. Napolitano assured respondents that the $6,000 would be returned to them at the end of the term, or before that if the building was condemned at an earlier date.

On the next morning, October 3, 1946, respondents and Mr. Napolitano executed the lease. At that time, in answer to respondent Mintzer's question: "Felix, did you get that money from Eddie Berger?" Mr. Napolitano said: "Yes, that's been taken care of."

While on the stand, Mr. Napolitano admitted that he received from respondents a check for $780: $260 for the first month's rent, and $520 for the last two months' rent. He denied that he either asked for or ever received the $6,000.

No mention of the $6,000 is made in the lease. However, Mr. Feldman testified that respondents requested a clause be put in the lease showing payment of the $6,000, but Mr. Napolitano told them that for reasons of his own he did not want it mentioned in the lease.

There is evidence in the record that during November, 1946, and also in the month of January, 1947, because business was very bad and they were losing money, respondents asked Mr. Napolitano to make an adjustment by taking out of the $6,000 "whatever damages he considered fit, and return the money to us, the balance."

In connection with its first point, appellant urges that the testimony of respondents was inherently improbable and difficult to believe; and that they failed to prove payment by a preponderance of the evidence.

As stated in *Hughes* v. *Quackenbush,* 1 Cal.App.2d 349, 354 [37 P.2d 99]: "Of course, testimony which is inherently improbable may be disregarded. (*Nielson* v. *Houle,* 200 Cal. 726 [254 P. 891].) But to warrant such action there must exist either a physical impossibility of the evidence being true or its falsity must be apparent, without any resort to inferences or deductions. (*Powell* v. *Powell,* 40 Cal.App. 155 [180 P. 346]; *Stahmer* v. *Stahmer,* 125 Cal.App. 132 [13 P.2d 833].) As said in *Powell* v. *Powell, supra*:

"'The appellate court will not indulge in lengthy and dubious computations, nor seek for a reason, no matter how ingenious may be the argument by which it is urged, to determine that witnesses have committed perjury. It is its duty, if possible, to harmonize apparent inconsistency in their statements, and to do this it will indulge in every reasonable presumption of fact.'"

Although the facts disclosed by the record are unusual, to say the least, they are not so improbable as to be unworthy of belief.

On the question of payment, the testimony was in direct conflict. The trial court resolved this issue in favor of the respondents and it is not within the province of this court to interfere.

Appellant's second point is an assertion of the general rule that the terms of a written contract may not be varied by parol. Specifically, it is argued, that since respondents' answer makes reference to the $520 fund as "further security" and at one place in the findings the trial court refers to the sum of $6,520 as security for the payment of rent under the lease, therefore the character of the $520 fund was established as *security*, and evidence of the oral payment of $6,000 was inadmissible as a variance of the terms of the lease.

However, the judgment herein is based on the cross-complaint, in which it is alleged that appellant (cross-defendant) received the $6,000 "to secure itself against any possible damages which it might sustain by reason of the cross-complainants' failing to abide by the terms of the aforesaid lease; . . .

"That in addition to the aforementioned $6,000.00 in cash . . . cross-complainants gave to the cross-defendant $520.00 as and for consideration of the signing of the aforementioned lease."

The trial court found in accordance with such allegations, to wit: that the $6,000 was given and received as security for performance of the terms of the lease, and that the $520 was given "as and for consideration of the signing of the aforementioned lease, which $520.00 was to apply to the last two months rent on the said premises."

Moreover, the lease itself provides: "12. In consideration of the signing of this lease, the lessees hereby pay to the lessor the sum of Five Hundred and twenty dollars ($520.00), and in the event that there is no breach of the terms and conditions of this lease by the said lessees during the term hereof, the lessees will pay to the lessor the sum of One Dollar ($1.00) a month for the last two months of the term of the lease. . . ."

Since the trial court's specific findings with respect to the two sums of $6,000 and $520, are entirely in accord with the allegations of the cross-complaint, with the evidence produced at the trial, and with the terms of the lease, the inconsistent finding pointed out and relied upon by appellant becomes immaterial.

The following excerpt from 10 California Juris-

prudence 927, section 195 (Evidence) appears applicable to the instant situation:

"One of the exceptions to the general rule excluding extrinsic evidence as varying or adding to the terms of a written instrument permits proof of the execution and existence of an oral agreement collateral to and executed contemporaneously with the written instrument, covering and controlling a material matter agreed to by the parties, distinct from but closely related to the express subject matter of the written instrument and not embodied therein. Of course this exception applies to a written instrument which prima facie purports to embody the complete obligations of the parties, only where the circumstances attending its execution warrant the inference that the parties did not intend that it should be a complete and final statement of the whole transaction. The reason for the exception is said to be found in the fact that the exclusion of such evidence when relevant to the issues joined would operate to permit one party to take an unjust advantage of the other by receiving the benefits accruing to him under the contract without assuming the burdens imposed. Evidence of a contemporaneous oral agreement as to any matter upon which the instrument is silent, and which is not inconsistent with its terms, cannot be said to contradict or vary the terms of the written instrument." See *Dobbins* v. *Horsfall*, 58 Cal. App.2d 23, 29 [136 P.2d 35], and authorities there cited.

As heretofore pointed out, no place in the lease is the subject of security mentioned.

■ Appellant also requests a consideration of the applicability of the statute of frauds to the oral agreement here in question. Suffice to say that it ill becomes appellant to suggest this point, in view of the testimony that Mr. Napolitano refused to permit that any mention of the $6,000 payment be made in the lease. (See *Kaye* v. *Melzer*, 87 Cal.App.2d 299, 306 [197 P.2d 50].)

■ An agreement which contemplates the deposit of a fund as security for performance of a lease is valid and enforceable. *Giddens* v. *Krogh*, 116 Cal.App. 416 [2 P.2d 821]; *Sullivan, Inc.* v. *Johnson*, 116 Cal.App. 591 [3 P.2d 72]; *Depner* v. *Joseph Zukin Blouses*, 13 Cal.App.2d 124 [56 P.2d 574].

"The lessor is entitled to retain the deposited fund until complete discharge by the lessee of the obligations the performance of which the deposit is shown to have been intended to secure. The lessee having defaulted, the lessor becomes

entitled to resort to the deposited money. He has a right to retain the sum, applying it as payment of the amounts due as rental, until the money has been exhausted. . . . The lessee, equally, has a right to have the fund applied to the payment of rental.

"The lease contract being terminated, the lessee has a right to the fund, less any amount that may be due and unpaid on account of rental. A right to have the deposited sum returned to him, accrues in the event of a surrender of the premises and acceptance by the lessor." (7 Cal.Jur. 10-Yr. Supp. (1945 Rev.) 529, § 141, and authorities there cited.)

"It is settled in California that where there is an absolute payment of rent in advance for some portion of the term, or where there is a payment of a certain sum as a 'bonus' or 'consideration' for the execution of the lease, the lessor may retain it upon termination. (See *A-1 Garage* v. *Lange Inv. Co.,* 6 Cal.App.2d 593 [44 P.2d 681].) But if it is a deposit as security for the performance of the terms of the lease, it is treated as a provision for a penalty, and the lessor cannot keep the sum upon the lessee's breach. (*Redmon* v. *Graham,* 211 Cal. 491 [295 P. 1031]; *Sullivan, Inc.* v. *Johnson,* 116 Cal.App. 591 [3 P.2d 72].) These rules are established, and the only problem is one of application." *Bacciocco* v. *Curtis,* 12 Cal.2d 109, 114 [82 P.2d 385].

Accordingly, respondent lessees were entitled to recover the balance of the $6,000 deposit given as security for the performance of the lease after deduction of the rentals found to be due to appellant lessor.

As to the sum of $520 which was given as consideration for the lease, and which the trial court applied to the last two months' rent on the premises, appellant lessor is entitled to retain this amount because of respondent lessees' default. (*A-1 Garage* v. *Lang Inv. Co., supra,* 6 Cal.App.2d 593, 596.) This amount should not have been included in the security deposit.

It is next contended that the court erred in its dismissal of that portion of appellant's first cause of action seeking recovery of the difference between the rental provided under the lease and that received under the reletting.

The court found that the premises were surrendered by respondents to appellant on or about April 26, 1947. Also, that appellant relet the store on or about May 1, 1947, on its own account and not for the benefit of respondents; further that appellant never notified respondents that such

reletting was on their account or that they should be held responsible for any losses sustained by appellant as a result of said reletting. The evidence produced supports such findings.

In *Rehkopf* v. *Wirz*, 31 Cal.App. 695, 696 [161 P. 285], cited in the later case of *De Hart* v. *Allen*, 49 Cal.App.2d 639, 645 [122 P.2d 273], it is stated:

''Where a tenant abandons the leased property and repudiates the lease, the landlord may accept possession of the property for the benefit of the tenant and relet the same, and thereupon may maintain an action for damages for the difference between what he was able in good faith to let the property for and the amount provided to be paid under the lease agreement. . . . But a lessor who chooses to follow that course must in some manner give the lessee information that he is accepting such possession for the benefit of the tenant and not in his own right and for his own benefit. If the lessor takes possession of property delivered to him by his tenant and does so unqualifiedly, he thereby releases the tenant.''

It is finally urged that the evidence is insufficient to sustain the court's finding that no damage was done to the leased property, to wit: the small meat cooler.

The testimony upon this issue was highly conflicting, therefore the trial court's finding is conclusive on appeal.

For the reasons stated, the judgment is modified by reducing it from $4,960 to $4,440, and as so modified, the judgment is affirmed. Respondents to recover their costs on appeal.

White, P. J., and Doran, J., concurred.